**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict,<br><br>*Plaintiffs*,<br><br>v.<br><br>RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico; TERRY McGAHA, in his official capacity as Acting Executive Director of the New Mexico Gaming Control Board; PATRICK GARRETT, in his official capacity as Chairman and Commissioner of the New Mexico Gaming Control Board; INDY WHITE, in his official capacity as Commissioner of the New Mexico Gaming Control Board; VAN BILLOPS, in his official capacity as Commissioner of the New Mexico Gaming Control Board; MEKKO M. MILLER, in his official capacity as Commissioner of the New Mexico Gaming Control Board; and BILLY G. SMITH, in his official capacity as Commissioner of the New Mexico Gaming Control Board,<br><br>*Defendants*. | Civil Action No. |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict ("Underdog"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1. This action seeks to prevent the Attorney General of the State of New Mexico ("Attorney General") and the members and officials of the New Mexico Gaming Control Board ("Gaming Control Board") (collectively, "Defendants") from unlawfully exercising jurisdiction over, regulating, or terminating Underdog's offering of lawful derivatives contracts on federally regulated markets.

2. Underdog operates a federally regulated designated contract market ("DCM") that lists event contracts for trading in interstate commerce. Underdog is also a federally registered futures commission merchant ("FCM") that solicits or accepts orders for the purchase or sale of event contracts traded on other DCMs. Through the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-27f, Congress vested the U.S. Commodity Futures Trading Commission ("CFTC") with sole regulatory authority over event contracts and other derivatives traded on designated contract markets, including deciding whether to prohibit certain event contracts—such as contracts related to gaming—as contrary (or not) to the public interest. *Id.* § 7a-2(c)(5)(C). According to the CEA and CFTC, "event contracts" are derivatives or swaps whose returns are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency."[1]

---

[1] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

3. Pursuant to its DCM and FCM designations, Underdog offers event contracts in New Mexico. Since the CFTC has "exclusive jurisdiction" to regulate trading on DCMs, including through FCMs, under the CEA, 7 U.S.C. §§ 1 *et seq.*, Underdog's compliance with CFTC approval procedures authorizes Underdog to offer and facilitate the trading of event contracts in New Mexico. Nevertheless, Underdog now faces the imminent threat that Defendants will enforce New Mexico's gambling and gaming statutes against its federally regulated market. Indeed, the Attorney General has already brought an enforcement action against KalshiEX LLC ("Kalshi"), a DCM. *See* Complaint, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026).

4. Like Underdog, Kalshi is regulated by the CFTC. Even so, Defendants assert that, notwithstanding that the CFTC has exclusive jurisdiction to regulate DCMs and FCMs, event contracts traded on DCMs and through FCMs are "sports betting," "gambling," and "gaming" subject to New Mexico's Criminal Code and Gaming Control Act. *Id.* ¶¶ 6, 12, 116, 132. Underdog therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, potential criminal liability, and severe collateral consequences to its nationwide operations.

5. Any enforcement action by New Mexico would be meritless. Defendants' threat of enforcement is plainly inconsistent with Article VI, Clause 2, of the United States Constitution ("Supremacy Clause") and any enforcement efforts are therefore preempted. The CFTC has confirmed its position that New Mexico's enforcement of its gambling and gaming laws against CFTC-designated contract markets violates the Supremacy Clause by suing Defendants in this District. *See* Complaint, *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), ECF No. 1; *see also infra* ¶¶ 63. It has echoed this sentiment in each of the amicus

briefs, motions to intervene, emergency orders, and eight litigations it has filed across the country seeking to enforce its exclusive jurisdiction over derivatives trading on DCMs. *See infra* ¶¶ 63-64, 76-77.

6. Congress was explicit with its intent in enacting the CEA and giving the CFTC exclusive jurisdiction: because derivatives transactions are "affected with a national public interest," it was essential to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]." 7 U.S.C. § 5. Accordingly, federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[2] As the Third Circuit recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

---

[2] *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563-64 (6th Cir. 1998) (noting that "[f]utures trading is conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" and holding that a CEA regulation conflict preempted an Ohio statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA" (emphasis added)); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, No. 01 CIV. 11602(RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (dismissing state law claims as preempted by the CEA because they "would directly affect 'trading on or the operation of a futures market'" (citation omitted)).

7. Consistent with Congress's original purpose, each amendment to the CEA over the past century has only reinforced its intent to maintain a uniform system. For instance, Congress expanded the CFTC's exclusive authority to cover new products, including swaps and contracts on "excluded commodities," and authorized the CFTC to review and prohibit certain event contracts if it determines that their trading would be contrary to "the public interest." 7 U.S.C. § 7a-2(c)(5)(C). Consistent with its role, the CFTC has adopted regulations regarding when and how an event contract may be suspended as contrary to the public interest and has published copious guidance on its approach, most recently issuing a Notice of Proposed Rulemaking on the topic. *See* 17 C.F.R. § 40.11; Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40). This Notice of Proposed Rulemaking would amend 17 C.F.R. § 40.11 to define the enumerated categories of event contracts, including "gaming," and the factors the CFTC may consider to determine whether an event contract is "contrary to the public interest." *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. at 35,859-61.

8. Underdog thus seeks declaratory and injunctive relief to protect its ability to operate federally regulated markets in New Mexico. Any attempt by New Mexico to regulate trading on DCMs (including through FCMs) is expressly preempted. Congress grants the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps," such as event contracts. 7 U.S.C. § 2(a)(1)(A).

9. New Mexico regulation of trading on DCMs (including through FCMs) is also preempted because Congress has fully occupied the field of regulating federally registered DCMs,

thereby preempting any overlapping state laws including state licensing or registration conditions that New Mexico might purport to apply to Underdog.

10. Lastly, New Mexico regulation of trading on DCMs (including through FCMs) that would require Underdog to cease offering federally authorized event contracts is additionally preempted because it directly conflicts with the CEA's framework. Underdog cannot comply with both its federal law obligations and any purported obligations under New Mexico law. Moreover, ceasing operations in New Mexico would, among other things, undermine the CEA's goals of creating a uniform system of derivatives trading and violate CFTC guidance intended to promote uniform and fair markets. Indeed, it would cause the exact harm the CEA sought to prevent: traders could open a position outside of New Mexico, travel to New Mexico, and, while there, lose the ability to close or expand their existing position due to New Mexico's application of its gaming regulations.

11. The threat of Defendants' enforcement of New Mexico law poses a direct and imminent threat to Underdog's business and its users, and leaves Underdog with a "Hobson's choice" wherein both its options will cause irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Either Underdog can continue to operate in New Mexico, "expos[ing] [itself] to potentially huge liability," including civil and criminal penalties, reputational damage, and competitive disadvantage, or it can "suffer the injury of obeying [New Mexico's] law" despite the fact that it is preempted. *Id.*

12. In light of the imminent threat it faces as a result of Defendants' intention to wrongfully enforce New Mexico law, Underdog brings this action to protect its right to offer event

contracts pursuant to federal law and regulation, maintain the integrity of the federal regulatory framework, and avert imminent harm to its business operations.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether New Mexico law is preempted by the CEA as applied to Underdog's event contracts. And the Court has the power to declare the rights and legal relations of the parties under the Declaratory Judgment Act, 28 U.S.C. § 2201.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2). Defendants reside in New Mexico and perform their official duties in this District, and a substantial part of the events giving rise to the claims occurred in this District.

15. The Eleventh Amendment does not bar this action. Underdog sues only state officials, in their official capacities, for prospective declaratory and injunctive relief to halt the threatened enforcement of state law that violates federal law. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002).

## PARTIES

16. Plaintiff Underdog Exchange DCM, Inc. is a Delaware corporation headquartered in Brooklyn, New York. It operates a DCM regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

17. Plaintiff UDM, LLC, doing business as Underdog Predict, is a Delaware limited liability company headquartered in Brooklyn, New York. It is an FCM regulated by the National

Futures Association ("NFA") and the CFTC under the CEA, offering event contracts traded on other CFTC-registered DCMs.

18. Defendant Raúl Torrez is the Attorney General of the State of New Mexico and is sued in his official capacity. The Attorney General is the State's chief legal officer. *See* NMSA 1978, § 8-5-2.

19. Defendant Terry McGaha is the Acting Executive Director of the New Mexico Gaming Control Board and is sued in his official capacity.

20. Defendant Patrick Garrett is the Chairman and a Commissioner of the New Mexico Gaming Control Board and is sued in his official capacity.

21. Defendant Indy White is a Commissioner of the New Mexico Gaming Control Board and is sued in his official capacity.

22. Defendant Van Billops is a Commissioner of the New Mexico Gaming Control Board and is sued in his official capacity.

23. Defendant Mekko M. Miller is a Commissioner of the New Mexico Gaming Control Board and is sued in his official capacity.

24. Defendant Billy G. Smith is a Commissioner of the New Mexico Gaming Control Board and is sued in his official capacity.

25. Together, Defendants Attorney General Raúl Torrez, Terry McGaha, Patrick Garrett, Indy White, Van Billops, Mekko M. Miller, and Billy G. Smith would be responsible for enforcing the New Mexico laws that are preempted by federal law.

## FACTUAL ALLEGATIONS

### A. Underdog Operates Federally Registered Marketplaces For Trading Event Contracts.

26. Underdog operates a federally regulated DCM that provides a marketplace for trading in derivatives products, including event contracts. Underdog is also a federally regulated FCM that allows traders to use its platform to trade event contracts listed on other CFTC-registered DCMs.

27. Underdog registered its FCM with the NFA and CFTC on January 9, 2026, confirming that its platform complied with the CEA. As an FCM, Underdog began offering event contracts in New Mexico on March 21, 2026.

28. The CFTC granted Aristotle Exchange DCM, Inc. its DCM designation on September 5, 2025, confirming that its market complied with the CEA. In March 2026, Underdog acquired Aristotle Exchange DCM, Inc. and its associated Derivatives Clearing Organization. Underdog announced the launch of its DCM on July 18, 2026.[3] On August 31, 2026, Aristotle Exchange DCM, Inc. filed a name change and is now named Underdog Exchange DCM, Inc.

29. From July 12, 2026 to September 2, 2026, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), (d), Underdog obtained CFTC certification for hundreds of event contracts.

30. On July 20, 2026, pursuant to its DCM designation, Underdog began offering its DCM event contract listings in New Mexico.

### B. Congress Intentionally Vested the CFTC With Comprehensive and Exclusive Jurisdiction to Regulate Derivatives—Including Event Contracts—on Federally Registered Markets.

---

[3] Press Release, Underdog, Underdog Launches Prediction Markets on its own Exchange, (July 18, 2026), https://www.underdogsports.com/news/underdog-launches-prediction-markets-on-its-own-exchange.

31. Derivatives are financial instruments used to allocate risk between counterparties. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The classic example is the grain futures contract, which permits buyers to mitigate the risk of volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date. However, the underlier of a derivative can vary widely, allowing market participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. Indeed, almost any type of risk can be hedged, as long as a CFTC-regulated market exists and a contract is available.

32. States have long viewed futures contracts with suspicion, equating trading on uncertain outcomes with gambling. Over a century ago, before the federal government began regulating derivatives markets, several states enacted outright bans on futures trading or subjected it to onerous restrictions under their gaming statutes. The resulting patchwork of often conflicting state regulation, poorly suited to facilitating a uniform national financial market, prompted Congress to take action.

33. First, Congress passed the 1922 Grain Futures Act, which required futures transactions for grain to be conducted on contract markets designated by the Secretary of Agriculture, centralizing trading on grain. Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, 1000 (1922).

34. Then, in 1936, Congress strengthened this federal scheme by enacting the CEA. The CEA established a uniform federal framework for regulating futures markets, extended federal authority to a broader class of commodities and created the Commodity Exchange Authority, a

division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation. However, Congress did not yet establish an independent federal agency to comprehensively regulate the nation's derivatives markets. It also did not completely foreclose the application of state law, clarifying in the statute itself that the federal law would not impair the enforcement of applicable state laws. Commodity Exchange Act, Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936).

35. As derivatives markets became more sophisticated and integral to the national economy, Congress worried that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156; *see also Leist*, 638 F.2d at 322 ("The federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *DGM Invs.*, 2002 WL 31356362, at *4 ("'Congress' intent to bring the markets under a uniform set of regulations' followed from a fear that states might attempt to regulate futures markets themselves and thus 'subject the national futures trading apparatus to conflicting regulatory demands.'" (citation omitted)); *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") ("different State laws would just lead to total chaos" (statement of Sen. Clark)). Similarly, the House Agriculture Committee stressed the need to bring "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 85 (1974).

36. Accordingly, in 1974, Congress enacted sweeping amendments to the CEA (the "1974 Act") and established the CFTC as an independent federal agency charged with regulating the national derivatives markets. And, to address the threat posed by conflicting state regulation, Congress added a provision expressly granting the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Congress also *eliminated* the 1936 provision providing that the CEA did not supersede or limit state jurisdiction "in order to assure that [f]ederal preemption [was] complete." 120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

37. In subsequent amendments to the CEA, Congress continued to reinforce the importance of exclusive federal control over derivatives markets through a single agency—the CFTC. For instance, the 1992 Futures Trading Practices Act ("FTPA") expanded the CFTC's regulatory authority by permitting the CFTC to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c). Congress also brought any such exempt financial instruments within the scope of the CFTC's exclusive authority by supplementing the existing express preemption provision, *id*. § 2, with a provision explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement. *Id*. § 16(e)(2).

38. Similarly, in 2010, Congress amended the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Once again, Congress expanded the CFTC's exclusive jurisdiction over derivatives markets. Congress added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction, *see id.* §

2(a)(1)(A), and expressly delegated authority to the CFTC and SEC to "further define" swaps as needed. 15 U.S.C. § 8302(d)(1). Congress also established a "Special Rule" expressly granting the CFTC discretionary authority to determine whether specific event contracts, including those that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or another similar activity, are "contrary to the public interest" and, if so, to prohibit them from trading on DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). The Special Rule explicitly contemplated CFTC regulation of sports-related event contracts by giving the CFTC authority to prohibit event contracts related to "gaming" if those contracts are contrary to the public interest. The Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but rather grants the agency the discretion to conduct a public interest review based on its own criteria.

39. Each iteration of the CEA has only reinforced Congress' intention to create a national market for derivatives products *despite* the concerns of individual states that derivatives markets should have remained under state control. Congress created a federal agency, vested it with exclusive jurisdiction, and centralized regulation over derivatives markets, granting the CFTC authority both to certify and prohibit derivatives products.

**C. The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory and Enforcement Framework for Trading Event Contracts.**

40. As a result of the CEA, the federal regulatory scheme governing the trading of derivatives, including event contracts, on DCMs and through FCMs is comprehensive and well-established.

41. To offer its derivatives for public trading, an entity must first be designated a contract market, or a DCM, by the CFTC. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The

designation process is rigorous and requires the applicant to demonstrate compliance with the CEA's Core Principles as set out by the CFTC. *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d); *infra* § J.

42. Among other things, this requires the applicant to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

43. Once approved and granted designation, a DCM becomes subject to an expansive regulatory framework administered by the CFTC. DCMs have extensive continuing federal obligations, including prescriptive capital and liquidity requirements, participant eligibility standards, reporting obligations, recordkeeping mandates, and operational and governance standards—all directed toward compliance with the CEA's Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31, 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

44. Because of the breadth and rigor of this regulatory framework, a DCM earning the CFTC's designation is accorded the status of a self-regulatory organization under federal law. DCMs are entrusted with front-line enforcement responsibilities, including establishing and enforcing market rules, detecting and preventing market abuses, and ensuring the integrity of all listed products and intermediaries. *See* 17 C.F.R. § 1.3; *id.* pt. 38.

45. In addition to its regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

46. The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division determines that a violation of the CEA has occurred, the CFTC may pursue civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and the suspension or revocation of registration and trading privileges. Criminal violations may be referred to the Department of Justice. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3.

47. Just like DCMs, FCMs are subject to comprehensive CFTC regulation. The CEA defines an FCM as "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28). FCMs are required to register with the CFTC, *id*. § 6f; 17 C.F.R. § 3.10(c), and to comply with reporting requirements to the CFTC, *id.* §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id*. § 1.55, minimum financial requirements, *id*. §§ 1.12, 1.17, and recordkeeping requirements, *id*. §§ 1.14, 1.18. They must also "establish, maintain, and enforce" a risk management program and adhere to related reporting requirements. *Id*. §§ 1.11(c)(1), 1.15.

Finally, FCMs must establish internal procedures to ensure compliance with trading standards, *id*. § 155.3, and adopt written policies and procedures to ensure compliance with conflict of interest regulations, *id*. § 1.71.

**D. Event Contracts Are Swaps Under the CEA.**

48. DCMs list event contracts for trading in interstate commerce. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, and are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency," 7 U.S.C. § 7a-2(c)(5)(C)(i), that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *See id.* § 1a(47) (defining "swap"); *id.* § 1a(19)(iv); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").[4] FCMs can serve as an intermediary for trading swaps on DCMs.

49. The CEA defines "swap" broadly to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). It additionally includes as swaps any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id*. § 1a(47)(A)(iv).

50. "[Event] contracts are not novel innovations." Brief for CFTC as Amicus Curiae Supporting Plaintiff at 7, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31. Since 1992, CFTC-registered exchanges have been listing derivatives with payouts based on events "as diverse as regional insured property losses, the count of bankruptcies, temperature

[4] Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

volatilities, corporate mergers, and corporate credit events." *Id*. (quoting 73 Fed. Reg. 25669, 25671 (May 7, 2008)).

**E. Event Contracts Have Price Discovery Benefits, Predictive Value and Allow Businesses to Hedge Risk.**

51. FCMs and DCM operators offering event contracts provide a neutral marketplace by matching counterparties to each other. They are not bookmakers. Unlike a casino, they do not set odds, assume directional risk, or take positions against their customers. Instead, they maintain a transparent marketplace with prices that reflect the supply and demand of a given position in real time.

52. Event contracts typically have a binary payoff structure dependent on the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

53. The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date. Accordingly, event contracts have enormous predictive value because their price is set based on the market's aggregated expectations about whether the underlying event will occur.

54. Event contracts also allow businesses to hedge the risks associated with the occurrence or non-occurrence of a particular event, and thus act as a valuable risk management

tool. For instance, sports-related event contracts can be used to hedge risk in many scenarios, including:

a. Media, broadcasting, and event ticketing companies facing financial exposure tied to viewership, which can fluctuate significantly depending whether there is a work stoppage or labor strike in a given sport, how competitive or interesting a game is, or how well a given team or franchise is playing;

b. Retailers selling team merchandise or apparel who see major swings in sales depending on whether a popular team advances or a particular player wins;

c. Travel and hospitality businesses exposed to spikes and falls in bookings dependent on whether a local team advances or hosts an event;

d. Restaurants and bars located around major arenas serving drastically different numbers of customers depending on whether a major event occurs,[5] or whether additional games in the NBA finals are played in a particular arena;

e. Advertising and marketing agencies with client campaigns tied to event outcomes, including guaranteed audience metrics, sponsor-activation thresholds, or promotional triggers linked to competition results;

f. Businesses running promotions tied to game results; and

g. Fantasy sports platforms and sports data providers relying on fan engagement and player performance.

---

[5] *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

55. This is not speculative. Companies such as Game Point Capital have already "arranged millions of dollars' worth of hedges through Kalshi."[6] Similarly, industry commentary has highlighted that event contracts will allow "small businesses that outright *depend on* a full 162-game MLB regular season schedule each year" to hedge their risks during a potential Major League Baseball ("MLB") lockout in 2027.[7] Indeed, these businesses can use Underdog to trade "yes" or "no" on an event contract regarding whether the MLB will have a "New [Collective Bargaining Agreement] Before Dec 2nd, 2026," *i.e.*, whether a lockout will occur, and an event contract regarding whether "the first game of the 2027 MLB regular season [will] commence before March 25, 2027." Without the ability to hedge such risks using event contracts, "[l]ocal bars, food vendors, parking lots, souvenir shops, and even ticket scalpers could see their revenues catastrophically slide if the MLB regular season is canceled or shortened due to stalled negotiations."[8]

56. The viability of event contracts' hedging function depends on the efficiency of the markets and thus relies on speculation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

---

[6] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html; Tarek Mansour (@mansourtarek_), X (Feb. 12, 2026, 3:38 P.M.), https://x.com/mansourtarek_/status/2022047766445535538?lang=en.

[7] *See* David Huber, Prediction Market Hedging Could Become Mainstream During 2027 MLB Negotiations, Deadspin (Aug. 7, 2026), https://deadspin.com/prediction-markets/legal-news/prediction-market-hedging-could-become-mainstream-during-2027-mlb-negotiations/ (emphasis in original); *see also* Joe Peta (@MagicRatSF), X (Aug. 4, 2026, 12:59 A.M.), https://x.com/MagicRatSF/status/2084866766732423467?s=46 (noting the extremity of the "binary economic impact for dozens of cities, hundreds of business and thousands of people" the outcome of Kalshi's market for how many MLB games will be played next season has, such that "[w]e should be cheering @Kalshi for its existence").

[8] Huber, *see supra* n.7.

57. As the CFTC has explained, "[i]n addition to their information aggregation, price discovery, and price dissemination functions, prediction markets allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists" such as "'sporting events . . . that generate billions of dollars in economic activity and materially affect both regional and national markets.'" Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,807-08 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

**F. The CFTC Has Exclusive and Discretionary Authority to Permit or Prohibit Event Contracts.**

58. A registered DCM is permitted to list new derivatives contracts—including event contracts—for trading without obtaining the CFTC's prior approval of each individual contract. Instead, the DCM must certify to the CFTC that each new contract complies with applicable regulatory standards by filing a written certification prior to listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC then has a period of time to review and object to the submission before listing. If it fails to act during that period, the contract is deemed "effective" and may be listed for trading. *See* 7 U.S.C. § 7a-2(c). The CFTC may also conduct a discretionary review after the contract has been listed.

59. Under the CEA's "Special Rule," Congress expressly granted the CFTC discretionary authority to prohibit trading on specific event contracts, including those that reference gaming, if they are "contrary to the public interest." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress did not authorize states to override or nullify federal authorization of event contracts by deeming them unlawful under state gambling law. *See* 17 C.F.R. § 40.11; 7 U.S.C. § 7a-2(c)(5)(C).

60. The CFTC has established procedures by which it may determine whether trading in a specific contract should be suspended and retains authority to initiate a formal review of any submitted contract under its own rules. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11. This includes a 90-day discretionary review period, during which the CFTC may determine a contract is contrary to the public interest and order the DCM to suspend its trading. *See* 17 C.F.R. § 40.11(c). This mechanism ensures continued federal oversight while permitting market innovation to proceed without pre-approval delays for each new product.

61. On June 10, 2026, the CFTC issued a Notice of Proposed Rulemaking, proposing amendments to this discretionary review process. The proposed rule defines "gaming" and imposes three conditions that must occur before a contract may be deemed contrary to the public interest. *See* CFTC Release No. 9249-26. First, the agreements, contracts, transactions, or swaps must be based upon the occurrence, extent of an occurrence, or contingency. *Id.* Second, the agreements, contracts, transactions, or swaps must "involve" any of the enumerated activities (gaming, war, terrorism, assassination, and activities illegal under state and federal law). *Id.* Third, the CFTC must affirmatively determine that the agreements, contracts, transactions, or swaps are contrary to the public interest. *Id.*

**G. The CEA and the CFTC Have Confirmed the CFTC's Exclusive Authority Over Event Contracts Traded On DCMs and Through FCMs.**

62. To ensure uniformity in event contract markets and preserve the accuracy of event contract pricing, Congress granted the CFTC exclusive authority to regulate event contracts listed on DCMs and FCMs, including the event contracts Underdog offers directly and as an intermediary, as a subcategory of derivatives. *See* 7 U.S.C. § 1a(47)(A)(ii), (iv), (vi); *supra* § B.

Indeed, "event contracts" are specifically addressed in the CEA and in the Special Rule of the 2010 Dodd-Frank Act. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 7 U.S.C. § 1a(19)(iv).

63. The CFTC has further confirmed its exclusive authority to regulate event contracts listed on DCMs and FCMs through litigation. The CFTC has brought actions against the states and state regulators in eight states, including New Mexico, alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026); *United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026). Additionally, the CFTC successfully moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), ECF No. 19. The CFTC has also submitted briefs as an *amicus curiae* in Michigan, Nevada, Ohio and Tennessee. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026), ECF No. 63; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *QCX, LLC v. Nessel*, No. 26-1552 (6th Cir. Aug. 24, 2026), ECF No. 20.

64. The CFTC has also issued several notices, including Release No. 9194-26 (Mar. 12, 2026) and Prediction Markets Advisory (CFTC Letter No. 26-08), explaining that event contracts are "swaps" under the CEA. The CFTC's most recent Notice of Proposed Rulemaking, Release No. 9249-26 (June 10, 2026), once again confirmed that "Congress vested the Commission with 'exclusive jurisdiction' over 'transactions involving swaps'" and that event contracts are swaps. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,808-11 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

**H. New Mexico Extensively Regulates Gambling.**

65. "Exercising its traditional police powers . . . New Mexico has tightly regulated gambling and gaming within the State for decades." Complaint ¶ 8, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026).

66. Under New Mexico law, the Attorney General shall "prosecute and defend . . . all actions . . . in which the state may be a party or interested when, in his judgment, the interest of the state requires such action . . . ." NMSA 1978, § 8-5-2(B). At the request of the Gaming Control Board, the Attorney General "may institute a civil action in any court of this state against any person to enjoin a violation of a prohibitory provision of the Gaming Control Act." *Id.* § 60-2E-48(A).

67. The Gaming Control Board "shall implement the state's policy on gaming consistent with the provisions of the Gaming Control Act." *Id.* § 60-2E-7(A). The Board is empowered to "conduct investigations," to "compel the appearance of . . . persons for the purpose of ascertaining compliance with" the Act, to conduct hearings, to "inspect all places where gaming activities are conducted" and "summarily seize, remove and impound" gaming devices, and to

impose civil fines for violations of the Act. *Id.* § 60-2E-7(C)(4), (11)-(12). And the Board's Executive Director "shall take administrative action by issuing orders and instructions . . . to assure implementation of and compliance with" the Act. *Id.* § 60-2E-10(D)(2).

68. New Mexico's Criminal Code makes "gambling," including "making a bet," a crime, *id.* § 30-19-2(A)-(B), and defines a "bet" as a bargain in which, "dependent upon chance, even though accompanied by some skill, one stands to win or lose anything of value . . . . ," *Id.* § 30-19-1(B). It separately criminalizes "commercial gambling"—including "receiving or forwarding bets" and setting up or collecting the proceeds of a "gambling device," *id.* § 30-19-3(B), (F)—and accepting anything of value for a fee to be transmitted for wagering on a sporting event. *See id.* § 30-19-15(A). Any "gambling device" not licensed under the Gaming Control Act "is a public nuisance per se," which the Attorney General may sue to abate. *Id.* §§ 30-19-1(C), 30-19-8; *see also id.* §§ 30-8-1, 30-8-8.

69. The Gaming Control Act, NMSA 1978, §§ 60-2E-1-62, declares that "limited gaming activities should be allowed in the state if those activities are strictly regulated." *Id.* § 60-2E-2(A). "Gaming" under this act is "offering a game for play," and a "game" is "an activity in which, upon payment of consideration, a player receives a prize or other thing of value, the award of which is determined by chance even though accompanied by some skill." *Id.* § 60-2E-3(O), (P). "A person shall not conduct gaming unless the person is licensed as a gaming operator," *id.* § 60-2E-13(A), and shall not "sell, supply or distribute a gaming device or associated equipment for use or play in this state" without a manufacturer's or distributor's license. *Id.* § 60-2E-13(B). The Gaming Control Act permits "[g]aming activity" only "if it is conducted in compliance with

and pursuant to" the Act or another "state or federal law" that "expressly permits the activity or exempts it from the application of the state criminal law, or both." *Id.* § 60-2E-4(B).

70. No license is available to an exchange like Underdog. Under the Gaming Control Act, "[o]nly a racetrack licensed by the state racing commission or a nonprofit organization may apply for or be issued a gaming operator's license." *Id.* § 60-2E-26(I). The Attorney General has so alleged, pleading that Kalshi "do[es] not qualify for a gaming operator license, even if [it] applied for one," and is therefore "ineligible for a license." Complaint ¶¶ 136-37, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026). New Mexico law authorizes no online gaming or wagering of any kind, and, by the Attorney General's own account, "[t]he only sports betting that has been expressly permitted within the territorial boundaries of New Mexico occurs on tribal lands" under tribal-state compacts. *Id.* ¶ 97 n.36. The Act also bars persons under twenty-one from playing or placing wagers on any game offered under it. *See* NMSA 1978, § 60-2E-37(A).

### I. Defendants Have Enforced New Mexico Law Against a CFTC-Regulated Prediction Market and Have Not Disclaimed Enforcement Against Others.

71. On June 4, 2026, the Attorney General filed a civil enforcement action in the First Judicial District Court, Santa Fe County, against Kalshi, a CFTC-designated contract market, alleging that Kalshi "operate[s] as a digital platform for sports betting and continues to operate unlawfully within New Mexico," and that "[b]y offering unlicensed online sports betting—including to underage players—Kalshi violates numerous provisions of New Mexico's Criminal Code and Gaming Control Act." Complaint ¶¶ 6, 12, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026). The complaint never mentions the CEA, the CFTC, or Kalshi's federal designation, and it expressly disclaims

any federal claim. *See id.* ¶ 22. In announcing the suit, the Attorney General declared that "[t]he only lawful gaming in New Mexico operates either under tribal-state gaming compacts, or under strict state regulations," and that Kalshi "has ignored that framework entirely while offering online sports betting within the state."[9]

72. The Attorney General asserts that, by listing event contracts referencing sporting events, Kalshi "conduct[s] gaming" and must be "licensed as a gaming operator." Complaint ¶¶ 132-133, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026). The Attorney General also contends that Kalshi's platform is a "gaming machine," a "gaming device," and a "gambling device," that the platform is a "public nuisance per se," that Kalshi "knowingly" permits persons under twenty-one to game, and that Kalshi "actively induces New Mexico residents to engage in criminal behavior." *Id.* ¶¶ 141-42, 152-53, 155, 159, 164. The Attorney General seeks a permanent injunction barring Kalshi from engaging in any sports-related "gambling" or "gaming" or operating any "gambling device" or "gaming device" that facilitates it, a declaration that Kalshi's conduct is a public nuisance, and an order of abatement. *Id.*, Prayer for Relief ¶¶ 2-4.

73. Kalshi removed the action to this Court on June 8, 2026, and the Attorney General's motion to remand is pending. *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. 1:26-cv-01857 (D.N.M.), ECF Nos. 1, 30. On June 12, 2026, the United States and the CFTC sued the State, the Governor, the Attorney General, and the members of the Gaming Control Board in this District,

---

[9] Press Release, N.M. Dep't of Just., *Attorney General Raúl Torrez Files Lawsuit Against Kalshi to Protect New Mexico Consumers and Preserve New Mexico Gaming Laws* (June 4, 2026), https://nmdoj.gov/press-release/attorney-general-raul-torrez-files-lawsuit-against-kalshi-to-protect-new-mexico-consumers-and-preserve-new-mexico-gaming-laws/.

alleging that New Mexico's enforcement of its gambling and gaming laws against CFTC-designated contract markets is preempted by the CEA. *See* Complaint, *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), ECF No. 1. On June 18, 2026, the United States and the CFTC moved for a preliminary injunction. *See* Motion for Preliminary Injunction, *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 18, 2026), ECF No. 13.

74. Rather than pause its enforcement efforts, the Attorney General opposed the motion and moved to dismiss, arguing that "Congress did not grant CFTC authority to preempt longstanding state sports betting laws." Memorandum in Support of Motion to Dismiss at 2, *United States & CFTC v. New Mexico*, No. 1:26-cv-01912-KG-JFR (D.N.M. July 16, 2026), ECF No. 23; Motion to Dismiss, *United States & CFTC v. New Mexico*, No. 1:26-cv-01912-KG-JFR (D.N.M. July 16, 2026), ECF No. 22. Both motions are fully briefed and await decision. *Id.*, ECF Nos. 30, 31.

75. Defendants' theory is not limited to Kalshi. After the Attorney General sued Kalshi, QCX LLC d/b/a Polymarket US ("Polymarket"), a DCM, asked the New Mexico Department of Justice to defer any enforcement against it pending resolution of the Kalshi action and, later, of the CFTC's motion for a preliminary injunction. On June 29, 2026, the Department rejected both requests, and Polymarket brought suit the next day. Complaint ¶¶ 2, 68-70, *QCX LLC v. Torrez*, No. 1:26-cv-02100 (D.N.M. June 30, 2026), ECF No. 1. Ludlow Exchange, LLC d/b/a Novig ("Novig"), a DCM, filed a similar action on August 6, 2026, the same week it began offering event contracts to persons in New Mexico. Complaint ¶¶ 4, 85, *Ludlow Exch., LLC v. Torrez*, No. 1:26-cv-02576 (D.N.M. Aug. 6, 2026), ECF No. 1.

**J. The CFTC Has Made Clear That Compliance With New Mexico's Demands Violates The CEA's Core Principles.**

76. As required by the CEA, the CFTC has adopted regulations setting out these "Core Principles," which DCMs must follow. One such regulation, Core Principle 2, requires DCMs to offer "impartial access" to their markets and services to users across the country. *See* 17 C.F.R. § 38.151(b). In its complaint against Defendants in this District, the CFTC explained that its regulations "require DCMs to provide 'impartial access' to all eligible participants nationwide," and that "New Mexico's enforcement efforts would require DCMs to violate that rule by forcing them to deny event contracts to residents of New Mexico." Complaint ¶ 71, *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), ECF No. 1. It further explained that "[i]f States can regulate the offering of event contracts by DCMs, then DCMs would face the prospect of 50 regulators across the country, which defeats Congress's design of centralizing derivatives regulation." *Id.* ¶ 72 (citing 17 C.F.R. § 38.151(b)).

77. The CFTC has made clear that compliance with state enforcement actions would violate the Core Principles, bringing DCMs out of compliance with their obligations under the CEA. For instance, on August 11, 2026, the CFTC issued an emergency order directing Kalshi and its affiliates to continue to perform its functions as an exchange in response to New York's ongoing enforcement action against Kalshi.[10] The CFTC stated that compliance with New York's proposed TRO, if granted, would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement

[10] Order Directing Kalshi to Continue Exercising DCM Functions at 9, In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration, CFTC (August 11, 2026), https://www.cftc.gov/PressRoom/PressReleases/9281-26 (hereinafter "New York CFTC Order").

process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" *Id*. at 8-9 (citing 7 U.S.C. §§ 7(d)(4), 7(d)(9)). Similarly, on July 14, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business."[11] The CFTC found that the Michigan court's "unprecedented order" constitutes a "'major market disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts" and that "forced liquidation of trades will cause distortions" which "would, among other things, violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id*. at 6-8. The CFTC's directives in its orders, both in New York and Michigan, would apply to Underdog with equal force here and nationwide.

**K. Defendants' Anticipated Enforcement Against Underdog Will Irreparably Harm Underdog and Preclude Its Ability to Comply With Federal Regulations.**

78. The threat of enforcement against Underdog is real, imminent, and concrete. Given New Mexico's definitive position on prediction markets, which has already produced an enforcement action against a prediction market company, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Underdog and its customers to irreparable harm. *See Morales*, 504 U.S. at 381 (no

[11] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, In re Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Commission Regulation 40.6(a), CFTC (July 14, 2026) at 3, 9, https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf (hereinafter "Michigan CFTC Order").

adequate remedy at law where attorneys general had "made clear" they would seek to enforce state law and thus "enforcement actions [were] imminent"). The prospect of an imminent enforcement action leaves Underdog with a "Hobson's choice" wherein both its options are certain to cause irreparable harm: either Underdog can "suffer the injury of obeying [New Mexico's] law" despite the fact that it is preempted, or it can continue to operate in New Mexico, "expos[ing] [itself] to potentially huge liability." *Id.*

79. If Underdog complies with New Mexico's wrongful assertion of its authority over DCMs by ceasing to offer event contracts in New Mexico, it will violate the CFTC's Core Principles, bringing Underdog out of compliance with its obligations under the CEA. *See supra* § J. Indeed, in response to state enforcement actions against Kalshi, the CFTC stated that compliance with state demands to cease operations would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)). Similarly, in response to Kalshi's notification that it planned to liquidate open derivative positions to comply with a state court order in Michigan, the CFTC stated that such a plan would "violate CEA Core Principle 4." Michigan CFTC Order at 8.

80. Compliance with New Mexico's demands would also be extremely costly and would cause reputational and competitive injury, particularly damaging to such a new DCM fighting for market share. Any economic losses Underdog incurs from ceasing operations would be unrecoverable because sovereign immunity bars recovery for monetary damages, causing

Underdog irreparable harm. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004) (loss of goodwill is an intangible harm that supports a finding of irreparable injury); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659-60 (2025) (per curiam) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'").

81. Further, Underdog cannot avoid irreparable harm by seeking a New Mexico gaming license. As a federally regulated DCM and FCM, applying for a state license would require Underdog to ignore the law—which mandates that Underdog obtain federal, not state, approval to operate—and abandon the federal rights it has obtained through its successful application to the CFTC for designation. Moreover, no license is available to it. *See supra* ¶ 70. And even if a license were available, the Gaming Control Act authorizes licensees to operate gaming machines only at the "gaming establishment identified in the license application," NMSA 1978, § 60-2E-26(C); *see id.* §§ 60-2E-3(T), 60-2E-27(A), 60-2E-28(A), which would confine Underdog's markets to persons physically present at a licensed facility in New Mexico, depriving those markets of the nationwide liquidity on which they depend and violating the CEA's requirement that a DCM provide "impartial access" to all eligible participants. *See* 17 C.F.R. § 38.151(b).

82. On the other hand, if Underdog refuses to acquiesce to New Mexico's wrongful position, it will almost certainly become subject to enforcement efforts, as shown by New Mexico's enforcement against Kalshi, Defendants' roles in enforcing New Mexico gambling and

gaming law, and Defendants' public statements committing to continue enforcing state law against prediction markets. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

83. The Attorney General sued Kalshi after Kalshi self-certified and listed sports-related event contracts that were available to persons in New Mexico through Kalshi's website and mobile applications, alleging that Kalshi thereby "conduct[s] gaming." *See* Complaint ¶¶ 28, 41-46, 64, 132, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026). Just like Kalshi, Underdog lists sports-related event contracts on its CFTC-designated contract market and makes them available to users through a mobile application and an internet website.[12]

84. The penalties for Underdog's non-compliance with an inapplicable state regulatory regime will be significant, and may be both criminal and civil. The Attorney General has alleged that Kalshi is in "continuing violation" of NMSA 1978, §§ 60-2E-13(A), 60-2E-13(B), 60-2E-37, and 60-2E-56(A); that its platform is a "public nuisance per se" under § 30-19-8; and that it "induces New Mexico residents to engage in criminal behavior" under §§ 30-19-2 and 60-2E-56. Complaint ¶¶ 138, 145, 153, 159, 164, *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026). Under New Mexico law, willfully violating a prohibitory provision of the Gaming Control Act, NMSA 1978, § 60-2E-57; knowingly permitting a person under twenty-one to participate in gaming, *id.* § 60-2E-56(A); "commercial gambling," *id.* § 30-19-3; and accepting anything of value for a fee to be transmitted

[12] Underdog, underdogsports.com.

for wagering on a sporting event, *id.* § 30-19-15(C), are each fourth degree felonies punishable by eighteen months' imprisonment and a fine of up to $5,000. *Id.* § 31-18-15(A), (E). The Gaming Control Board may also impose civil fines of up to $25,000 for a first violation of the Act and $50,000 for each subsequent violation, *id.* § 60-2E-7(C)(1).

85. The relief the Attorney General seeks against Kalshi confirms the severity of the threat: a permanent injunction barring Kalshi from engaging in any sports-related "gambling" or "gaming" or operating any "gambling device" or "gaming device" that facilitates it, a declaration that Kalshi's platform is a public nuisance, and an order that Kalshi abate it. *New Mexico ex rel. Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. June 4, 2026), Prayer for Relief ¶¶ 2-4. Such an order would bar a federally designated exchange from listing, matching, or settling federally certified contracts for any person in New Mexico. As the CFTC found in the analogous context of New York's enforcement action against Kalshi, such an assertion of state authority "cuts at the very heart of the Commission's jurisdiction and would have significant adverse ramifications for national and international financial markets," New York CFTC Order at 5, and permitting it to proceed would mean "a single State will effectively become the nationwide regulator of event-contract swaps on DCMs" and "threaten[] to unsettle derivatives markets generally." *Id.* at 5, 9.

86. Accordingly, Underdog has no plain, speedy, or adequate remedy at law to address the wrongs described herein and thus seeks injunctive and declaratory relief.

**COUNT I**

**(Express Preemption – Against All Defendants)**

87. Plaintiffs incorporate all prior paragraphs by reference.

88. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

89. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

90. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with New Mexico law, and without regard to whether Defendants have correctly interpreted New Mexico law, New Mexico law is preempted pursuant to the Supremacy Clause. Congress has expressly reserved exclusive authority over trading on federally regulated derivatives markets by giving the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges and thus to determine whether trading in particular event contracts is permitted. 7 U.S.C. § 2(a)(1)(A). Granting exclusive jurisdiction to the CFTC aligned with Congress' intent in enacting the CEA, which focused on establishing a unified approach to derivatives regulation and preventing patchwork state regulation, which Congress believed would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

91. Courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges. *See, e.g.*, *Flaherty*, 172 F.4th at 228; *United States & CFTC v. Minnesota*, No. 26-cv-2661 (KMM/DTS), 2026 WL 2150211, at *9-11, 13 (D. Minn. July 27, 2026); Order at 2-3, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), ECF No. 65; *KalshiEX LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026); *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d

1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

92. To the extent that New Mexico is attempting to enforce its laws—including the Gaming Control Act, NMSA 1978, §§ 60-2E-1 to -62; the gambling and nuisance provisions of the Criminal Code, NMSA 1978, §§ 30-19-1 to -15 and 30-8-1 to -14; the common law of public nuisance; and any regulations adopted thereunder (collectively, the "challenged provisions")—against federally regulated derivatives markets, New Mexico's enforcement is preempted. By threatening to enforce those or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

93. Therefore, Defendants may not enforce New Mexico's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**COUNT II**

**(Field Preemption – Against All Defendants)**

94. Plaintiffs incorporate all prior paragraphs by reference.

95. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

96. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with New Mexico law, and without regard to whether Defendants have correctly interpreted New Mexico law, New Mexico law is preempted pursuant to the Supremacy Clause.

97. As courts have recognized, "the CEA is recognized as establishing 'a comprehensive system for regulating futures contracts and options'" that grants the CFTC exclusive jurisdiction. *See, e.g.*, *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1194-95 (D. Colo. 2007) (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)). That system includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading, including event contracts. *See* 7 U.S.C. §§ 1 *et seq.*

98. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that leaves no room for parallel state regulation over which event contracts can be restricted.

99. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, enforcement of New Mexico's state laws against federally regulated derivatives markets is field-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228-29. Accordingly, by threatening to enforce the statutes referenced at ¶ 92 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

100. Therefore, Defendants may not enforce New Mexico's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**COUNT III**

**(Conflict Preemption – Against All Defendants)**

101. Plaintiffs incorporate all prior paragraphs by reference.

102. The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

103. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with New Mexico law, and without regard to whether Defendants have correctly interpreted New Mexico law, New Mexico law is preempted pursuant to the Supremacy Clause.

104. Defendants' attempts to ban and/or regulate event contracts that federal law and the CFTC have authorized plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason among others, the threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 229-30.

105. By threatening to enforce the statutes referenced in ¶ 92 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

106. Therefore, Defendants may not enforce New Mexico's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## PRAYER FOR RELIEF

An actual controversy exists between Underdog and Defendants regarding whether Defendants have legal authority to regulate the trading of event contracts not licensed by the New Mexico Gaming Control Board.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgment under 28 U.S.C. §§ 2201-2202 stating that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets, violate the Supremacy Clause and are therefore preempted and unconstitutional;

2. Issue a permanent injunction enjoining Defendants, their officers, employees, successors, and agents, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets;

3. Award any other relief within this Court's discretion that it deems just and proper.

Dated: September 8, 2026

*/s/ Meena H. Allen*
Meena H. Allen
ALLEN LAW FIRM, LLC
6121 Indian School Road NE, Ste. 230
Albuquerque, NM 87110
Telephone: (505) 298-9400
mallen@mallen-law.com

Robert A. Fumerton
(*pro hac vice* forthcoming)
David Meister
(*pro hac vice* forthcoming)
Judith A. Flumenbaum
(*pro hac vice* forthcoming)
One Manhattan West
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
robert.fumerton@skadden.com
david.meister@skadden.com
judy.flumenbaum@skadden.com

*Attorneys for Plaintiffs Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict*